UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN VONGVILAY,<br><br>    Petitioner,<br><br>    v.<br><br>GREG LEWIS,<br><br>    Respondent. | No. 2:12-cv-2680 CKD P<br><br>ORDER AND<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner, a state prisoner, is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2009 conviction for attempted murder, shooting at an occupied motor vehicle, possession of a concealed firearm, and firearm and gang allegations, for which he was sentenced to a state prison term of seven years plus twenty-five years to life. (ECF No. 2 ("Ptn.") at 4.) Respondent has filed an answer to the petition. (ECF No. 8.) Upon careful consideration of the record and the applicable law, the undersigned will recommend that the petition be denied.

BACKGROUND

I. Facts

In its affirmation of the judgment on appeal, the California Court of Appeal, Third Appellate District, set forth the relevant factual background as follows:

/////

1

In May 2005, David Lieng was attending school at Rio Casa Dera and was a member of the Hop Sing gang. On May 13, 2005, Lieng went to Valley High School with four other gang members, including defendant, to hang out during lunch. While they were there, they became involved in a fight. Lieng was unsure who they were fighting and thought it had started because someone had bumped into someone. In Hop Sing gang culture, it is common to back up a fellow gang member. The failure to do so could result in being beat up, stabbed, or shot.

On September 24, 2005, Lieng arrived at a party with about 20 to 30 other Hop Sing gang members looking for an individual with whom a gang member had a problem. A physical altercation, involving weapons, ensued. Shortly after the incident, Lieng was interviewed by Detective Jeffrey Beezley. Lieng identified the Hop Sing members who had been involved in the fight, including defendant's brother, as well as some Hop Sing Dai-los (powerful gang members who issue orders). Lieng's actions were considered "snitching" and snitches could be killed. After the interview, Lieng was beaten up by a Dai-lo and started distancing himself from the gang.

By October 2006, Lieng was still a Hop Sing gang member but no longer socialized with fellow gang members. He had been marked as a snitch. At around 11:00 p.m., on October 4, 2006, he was texting on his cell phone while waiting in his car outside a friend's house. His window was rolled down. Defendant drove up and stopped his car. His passenger got out of the car, walked up to Lieng's window and, as Lieng turned to look, shot Lieng in the face. As Lieng slumped over the passenger seat, he was shot again in the shoulder and the back of his head. Lieng survived but was not able to identify his assailant.

A couple of months later, Detective Beezley interviewed defendant about the shooting. Defendant initially claimed he had been in San Francisco at the Hop Sing gang headquarters at the time of the shooting, but later admitted he had been the driver of the car. He refused, however, to disclose the name of his passenger, as he did not want to be marked as a snitch.

Although defendant was not a validated Hop Sing gang member, Detective John Fan opined he was a gang member based on his tattoo, his possession of a black bandana, his association with other gang members, having contacted him in the field committing gang related crimes, and his admission to Detective Beezley during his interview. He also opined that two handguns found hidden in defendant's car were possessed for the benefit of the gang and were indicative of the fact that he was an active member. To move up in stature in the Hop Sing gang, a member has to put in "work," such as participating in fights, beatings, stabbings, and shootings. The more violent the crime, the more respect can be earned. The shooting of a snitch would constitute "work" for the gang.

At trial, defendant admitted he was a Hop Sing gang member, but claimed he had not done much "work" for the gang and was not

> looking to move up in stature because he was going to college. He testified that, although he was driving the car on the night of the shooting, he did not recognize Lieng's car or know there was going to be a shooting. After being told by the trial court that his testimony could be stricken if he continued to refuse to give the passenger's name, he revealed that Nguyen Tran was his passenger that night. There was no way he would have revealed Tran's name to Detective Beezley and he had been specifically told not to name names. After the shooting, Tran had said this is what happens to people who talk.

People v. Vongvilay, 2011 WL 2446684, at **1-2 (June 20, 2011); see ECF No. 8-1 at 2-4. The facts as set forth by the state court of appeal are presumed correct. 28 U.S.C. § 2254(e)(1).

II. Procedural History

On October 28, 2009, following a jury trial in the Sacramento County Superior Court, petitioner was found guilty of attempted murder (Cal. Penal Code § 664/187[1]), shooting at an occupied motor vehicle (§ 246), and possession of a concealed firearm while an active participant in a criminal street gang (§ 12025(b)(3)). The jury also found true allegations that at least one principal personally used a firearm and caused great bodily injury (§ 12022.53(b)-(e)(1)) and that the crime was committed for the benefit of a criminal street gang. (§ 186.22(b)(1)). (Lod. Doc. 1 ("CT") at 19-21, 269-271[2]).

On December 21, 2009, the trial court sentenced petitioner to a total determinate term of seven years plus an indeterminate term of twenty-five years to life in state prison. (CT at 296-297.) On June 20, 2011, the California Court of Appeal for the Third Appellate District affirmed the judgment. (Lod. Doc 8.) Petitioner filed a petition for review, which the California Supreme Court summarily denied on August 24, 2011. (Lod. Doc. 9.)

Petitioner filed the instant petition for federal habeas relief on October 30, 2012. (ECF No. 2.)

/////

/////

---

[1] All statutory references are to the California Penal Code unless otherwise indicated.

[2] Lodged Documents refer to those documents lodged by respondent on January 9, 2013. (ECF No. 9.)

3

ANALYSIS

I. AEDPA

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing

4

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must determine what arguments or theories supported or ... could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

The undersigned also finds that the same deference is paid to the factual determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination.  A petitioner must show clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 131 S. Ct. at 786-787.  Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not

5

qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection). The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early, supra, 537 U.S. at 8. Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim. Id. at 1097.

II. Petitioner's Claims

A. Miranda Violation

1. Claim

Petitioner claims that the trial court erroneously admitted statements obtained from him after he unequivocally invoked his Miranda[3] rights to terminate police interrogation, and that these wrongfully-admitted statements were the "centerpiece of the prosecution's case." (Ptn. at

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

6

15-23.[4])

Addressing petitioner's claim on appeal in the last reasoned decision, the Court of Appeal for the Third Appellate District set forth the relevant facts as follows:

> At the beginning of the interview, after being advised of his rights, defendant answered Detective Beezley's questions without any equivocation. He denied being a Hop Sing gang member and claimed his tattoo was unrelated to the gang. They discussed the guns found in defendant's car and defendant said he had them for protection. When Detective Beezley brought up the Lieng shooting, defendant claimed he was in San Francisco at the Hop Sing headquarters at the time of the shooting. When asked who he was talking to there, so officers could confirm his alibi, defendant responded, "I'm not trying to bring up no name." Detective Beezley indicated that he had talked to other gang members and knew defendant was lying. Defendant maintained that they could check the guns found in his car against the one used to shoot Lieng because he was in the Bay area, not at the shooting, and added, "But I'm not trying to tell you no more."
> 
> Detective Beezley continued to press defendant to tell him who pulled the trigger and defendant continued to insist he was not at the shooting. Detective Beezley finally told defendant that he had talked to other witnesses, knew what happened, and knew defendant's car was used in the shooting. Defendant responded, "If you know what happened, then why you asking me?" Detective Beezley said, "Because I need to know from you what you were thinking that night. That makes a big difference. I need to know the details from you." Defendant responded, "I'm not really trying to be a snitch." Detective Beezley then asked if all defendant did was drive, and defendant said, "Yeah." The following colloquy then took place:
>
> Detective Beezley: "You didn't switch places with the other guy?"
>
> Defendant: "*Nah on my mom or my pop. I'm not going to say nothing else*. (Unintelligible)."
>
> Detective Beezley: "Just a minute. Let me think about this."
>
> Defendant: "You guys just bring me in."
>
> Detective Beezley: "Hold on a sec, Dave—ah, Kevin. I just want to understand this. All you did was drive that night?"
>
> Defendant: [Nods head].
>
> Detective Beezley: "How many people were in the car?"
>
> Defendant: (No audible response).

---

[4] Page citations refer to numbers assigned by the court's docketing system.

7

> Detective Beezley: "I need to know. Besides you, there's at least one—
>
> Defendant: (Unintelligible).
>
> Detective Beezley: "—maybe two. How many?
>
> Defendant: "*I already told you my part that I was driving. That's all.*" (Italics added.)

Detective Beezley confirmed with defendant that he claimed he had just been driving. He then asked defendant how he ended up at the place where Lieng was parked and whether he had been looking for Lieng. Defendant responded: "Ah, we were driving around. After that somehow. I—I don't know. He just popped out of nowhere. It—it was like, oh. We just wait for him and just followed him. *That's all I got to say. Damn.* (unintelligible.) " Detective Beezley asked if he had received a phone call and defendant denied that. Detective Beezley then asked how many other people were with him in the car and defendant responded, "Like I said, I'm not trying to say no names" and "I can just say my part."

The interview continued, with Detective Beezley explaining the shooting was a very serious crime. Then, when defendant denied knowing what type of gun was used, Detective Beezley asked why he was lying again after starting to cooperate. Detective Beezley said, "You do know. You can't say you don't know. If you say you don't want to tell me, that—I understand that. But we need to move past this." Defendant responded, "I don't want to say nothing." Detective Beezley said, "Okay. You don't want to talk to me about—" and defendant interrupted with, "*Yeah. I don't want to talk about it.*"

The topic then returned to defendant's role as the driver. Detective Beezley again asked how many other people were with him in the car and defendant responded, "I don't really want to say. Like—like I said, I'm not—", "I am not being no snitch and then something (unintelligible)." Shortly after that, defendant clarified that he did not want to get hurt for being a snitch.

The interview continued and defendant continued to respond to questions asking for specific details about who else was involved in the shooting with statements such as, "Like I said, I'm not trying to be no snitch," "I'm not trying to say nothing much," "I'm not trying to say no names," "I am not gonna tell you nothing more," "I'm not trying to say," "I'm not trying to talk no more. I already talked—," "That's all I can say about my stuff. You know? Snitching on myself (unintelligible). That's the best I can do," and "Like remember I told you I—I'll only snitch on myself." When the interview concluded, defendant had still not revealed how many individuals were in his car that night and had refused to identify anyone involved in the shooting or in the gang.

People v. Vongvilay, 2011 WL 2446684, at **2-4. This summary is consistent with the

8

undersigned's review of the transcript of the December 13, 2006 interview. (Lod. Doc. 2, Clerk's Augmented Transcript (ACT) at 1-99.)

2. State Court Decision

Addressing the merits of petitioner's claim, the state court of appeal reasoned[5]:

> Defendant contends that the italicized statements were repeated and unequivocal invocations of his right to remain silent during his interrogation. We disagree.
>
> A defendant may invoke the right to remain silent by words or conduct that are reasonably inconsistent with a present willingness to discuss the case. (People v. Crittenden (1994) 9 Cal.4th 83, 129.) Under Miranda, interrogation must cease if the defendant indicates at any time or in any manner, prior to or during interrogation, that he is invoking his right to remain silent. (People v. Musselwhite (1998) 17 Cal.4th 1216, 1238.) A mid-interrogation invocation of the right to remain silent must be clear and unambiguous. (People v. Williams (2010) 49 Cal.4th 405, 434, citing Berghuis v. Thompkins (2010) 560 U.S. ——, —— [176 L.Ed.2d 1098, 1110].) "'Whether the suspect has indeed invoked that right, however, is a question of fact to be decided in light of all of the circumstances....' [Citation.]" (People v.. Musselwhite, supra, 17 Cal.4th at p. 1238.)
>
> Contrary to defendant's claim, it is not reasonable to construe any of his statements as an invocation of his right not to talk. While a desire to halt the interrogation may be indicated in a variety of ways, the words used by the suspect "must be construed in context." (In re Joe R. (1980) 27 Cal.3d 496, 515 (Joe R.).) Here, while defendant occasionally indicated he was not going to, or did not want to, say anything else ("I don't want to talk about it"; "I am not gonna tell you nothing more") those statements were interwoven with denials of culpability ("Nah on my mom or my pop. I'm not going to say nothing else"; "we were driving around.... That's all I got to say. Damn"), and his insistence that he would not snitch on anyone ("I already told you my part that I was driving. That's all"), and thus did not manifest an unequivocal desire to halt the interrogation. In fact, after the first statement defendant now claims was a clear invocation of his right not to talk, Detective Beezley remarked, "Just a minute. Let me think about this" and defendant continued talking.
>
> In context, defendant's remarks were indicative of his refusal to snitch on anyone other than himself. His refusal to answer certain questions, specifically those that would implicate others in the shooting, did not, however, invoke his right to remain silent and terminate the interview. A defendant may refuse to answer certain

---

[5] Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision. Y1st v. Nunnemaker, 501 U.S. 797, 801–806 (1991); Van Lynn v. Farmon, 347 F.3d 735 (9th Cir. 2003).

9

> questions without manifesting the desire to terminate the entire interview. (People v. Silva (1988) 45 Cal. 3d 604, 629–630.) California law makes clear the defendant does not have the right "to remain silent selectively." (People v. Hurd (1998) 62 Cal. App. 4th 1084, 1093.)
>
> We disagree with defendant and find Joe R. instructive. In Joe R., the minor was suspected of committing two robberies and, during the commission of one, his accomplice was shot by the victim. The minor waived his rights pursuant to Miranda and denied committing any offenses. (Joe R., supra, 27 Cal.3d at pp. 501–503.) When accused of lying and confronted with the evidence, he responded, " 'That's all I have to say.' " (Id. at p. 516; see id. at p. 503.) Law enforcement officers continued questioning and the minor eventually confessed to the two robberies but not to the homicide. (Id. at p. 503.) Rejecting the minor's assertion that he had invoked his right to remain silent, Joe R. concluded the minor's statement was not an unequivocal invocation of his right but simply a statement to the effect of, "That's my story, and I'll stick with it." (Id. at p. 516.)
>
> Likewise, other courts presented with similar ambiguous statements have decided the right to remain silent had not been invoked (People v. Williams, supra, 49 Cal. 4th at pp. 433–434 ["I don't want to talk about it" not an invocation of right but rather an expression of frustration with the officer's repeated refusal to accept his denials]; People v. Wash (1993) 6 Cal. 4th 215, 237–239 [" 'I don't know if I wanna talk anymore' " not an invocation of right]; People v. Jennings (1988) 46 Cal. 3d 963, 977–979 [" 'I'm not going to talk .... [t]hat's it' " and " 'I shut up' " not an invocation of right but rather "only momentary frustration and animosity" towards one of the questioning officers]; People v. Silva, supra, 45 Cal.3d at pp. 629–630 [" 'I really don't want to talk about that' " not an invocation of right but desire not to talk about whether he was driving]; People v. Castille (2003) 108 Cal. App. 4th 469, 488–489 [defendant's statement, "I can't talk no more," was not an invocation of the right to silence even though defendant was crying and struggling to speak].)
>
> Similarly, here, applying the totality of circumstances test, we find Detective Beezley did not violate defendant's Miranda rights.

People v. Vongvilay, , 2011 WL 2446684, at **4-5.

3. Discussion

In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer,

10

1  the right to remain silent and that anything stated can be used in evidence against him or her. Id.
2  at 473-74. Once Miranda warnings have been given, if a suspect makes a clear and unambiguous
3  statement invoking his constitutional rights, "all questioning must cease." Smith v. Illinois, 469
4  U.S. 91, 98 (1984).

5  A defendant may waive his Miranda rights, provided the waiver is "voluntary in the sense
6  that it was the product of a free and deliberate choice rather than intimidation, coercion, or
7  deception," and "made with a full awareness of both the nature of the right being abandoned and
8  the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986).
9  However, an express waiver of Miranda rights is not necessary. Berghuis v. Thompkins, 560
10 U.S. 370, 130 S. Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 37 (1979). After
11 a suspect is informed of his Miranda rights, Berghuis explained,

> Interrogation provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective. As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When the suspect knows that Miranda rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests. Cooperation with the police may result in more favorable treatment for the suspect; the apprehension of accomplices; the prevention of continuing injury and fear; beginning steps towards relief or solace for the victims; and the beginning of the suspect's own return to the law and the social order it seeks to protect.
>
> . . . In making its ruling on the admissibility of a statement made during custodial questioning, the trial court, of course, considers whether there is evidence to support the conclusion that, from the whole course of questioning, an express or implied waiver has been established. Thus, after giving a Miranda warning, police may interrogate a suspect who has neither invoked nor waived his or her Miranda rights.

23 See Davis v. U.S., 512 U.S. 452, 458 (1994) ("If the suspect effectively waives his right to
24 counsel after receiving the Miranda warnings, law enforcement officers are free to question
25 him."); Butler, 441 U.S. at 369-73 (waiver of Miranda rights can be inferred "from the actions
26 and words of the person interrogated"). See also Owen v. Florida Dept. of Corrections, 686 F.3d
27 1181, 1193 (11th Cir. 2012); cert. denied, 133 S. Ct. 2049 (2013) (on AEDPA review, it was not
28 unreasonable for state court to conclude that petitioner's confession was admissible because he

did not unequivocally invoke his right to remain silent, despite stating, at one point in interview, "I'd rather not talk about it."); Hurd v. Terhune, 619 F.3d 1080, 1088 (9th Cir. 2010) ("Thompkins make clear that a criminal defendant must affirmatively and unambiguously invoke his right to remain silent if he wishes to cut off police interrogation.").

Here, the state court of appeal properly considered the totality of the circumstances in determining whether petitioner invoked his right to remain silent during questioning. It considered that, after being informed of his Miranda rights, petitioner willingly answered many of Detective Beezley's questions, albeit with information that changed over the course of the interview – e.g., he initially maintained that he was in San Francisco on the night of the shooting, but eventually indicated that "my part . . . was driving. That's all." (ACT 33.) Petitioner responded to questions on a variety of topics, including whether he was a member of the Hop Sing gang and for how long, his alibi on the night of the shooting and who he was with, how he learned of the shooting, whether petitioner was the "shot caller" who ordered Lieng killed, the events on the night of the shooting, and the guns found in his car. However, petitioner consistently refused to identify anyone else involved in the shooting, stating repeatedly that he didn't want to "snitch." When pressed on this subject, petitioner stated: "I'm not trying to get hurt," suggesting that he feared retaliation if he provided names. (ACT 41.) Based on the totality of the interview, the state court reasonably determined that petitioner's statements amounted to an unwillingness to "snitch on anyone other than himself" rather than an unambiguous invocation of his right to remain silent.[6]

Accordingly, the undersigned concludes that the state court's determination that petitioner's confession was not involuntary within the meaning of the Due Process Clause was not contrary to, nor an unreasonable application of, federal law.[7] Thus petitioner's claim for

---

[6] In contrast, in a pre-Thompkins case cited by petitioner, the criminal defendant repeatedly responded to police questioning with the words: "No comment." Under these circumstances, the Ninth Circuit determined that he had invoked his Miranda rights. Arnold v. Runnels, 421 F.3d 859, 862-865 (9th Cir. 2005).

[7] In the absence of a finding that petitioner's statements to police were involuntary, the court does not reach the issue of whether admission of these statements at trial constituted harmless error.

1  habeas relief on this basis should be denied.

2  B. <u>Admission of Evidence</u>

3  1. <u>Claim</u>

Petitioner claims that the trial court erroneously admitted evidence of a May 2005 high school fight in which he participated, and that this error was prejudicial. In determining whether to admit evidence of the fight, the trial court observed that "everybody who is involved in our case was involved in that fight[.]" (Lod. Doc. 3, Reporter's Transcript (RT) 75.) The prosecutor argued that it showed members of Hop Sing "working in association with each other" to commit a crime, while defense counsel maintained that it was "a beef between two people . . . not the result of somebody giving gang signs, or anything like that . . . It was just a fight at school." (RT 75-76.) The trial court admitted the evidence for a limited purpose and admonished the jury

> not to consider [it] for any kind of propensity of violence for Mr. Vongvilay. The only reason it comes in is because this case charges gang enhancement. The shooting that we have was for the purpose of a gang. So this high school situation is only to show the extent, if any, which is for you to decide of Mr. Vongvilay's involvement with Hop Sing Gang.

(RT 107-108.) Petitioner argues that his membership in Hop Sing was "essentially undisputed," rendering evidence of the high school fight irrelevant and inflammatory. He argues that the limiting instruction did not suffice to cure its prejudicial effect.

2. <u>State Court Decision</u>

In the last reasoned decision on this claim, the state court of appeal wrote:

> Defendant also contends the trial court erred under Evidence Code Section 352 in admitting evidence of the high school fight that took place about 17 months before the crime. The evidence was admitted to establish defendant's participation, if any, in gang activity.
>
> We review the trial court's ruling on an Evidence Code section 352 objection under a standard of abuse of discretion. (<u>People v. Kipp</u> (2001) 26 Cal. 4th 1100, 1121.) For purposes of Evidence Code section 352, "prejudice" refers to evidence that " ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (<u>Ibid.</u>)
>
> Defendant argues the fight was not gang related and, therefore, should have been excluded under Evidence Code section 352 as lacking probative value. He boldly states that "there was not a

13

> scintilla of evidence to show that it was a premeditated gang related incident...." He argues that the evidence established it was simply a high school fight. Defendant then argues the prejudice of this evidence was great, relying heavily on authority discussing how admission of gang evidence can be highly inflammatory. Defendant cannot have it both ways.
>
> It was for the jury to decide if the evidence of the fight was gang related. The jury was instructed it could consider the evidence "only to show the extent, *if any*, which is for [the jury] to decide [defendant's] involvement with Hop Sing gang." (Italics added.) It was told it could not consider the evidence to show "any kind of propensity of violence" with respect to defendant. Thus, to the extent the evidence established a simple high school fight, as defendant argues, the jury would have no use for the evidence and evidence of a simple high school fight is not of the type that is "highly inflammatory."
>
> On the other hand, to the extent the evidence established defendant had been involved with the Hop Sing gang and participated in gang related activity, the evidence was clearly relevant to the charges in this case. We reject defendant's contention that such relevant evidence must necessarily be excluded on the ground that it was cumulative. That there was other evidence that defendant was a member of Hop Sing does not demonstrate abuse of discretion. How active defendant was in the gang was not undisputed and he was not a validated gang member at the time of the underlying crimes. Additionally, defendant maintained he had not done a lot of work for the gang and was not looking to move up in rank. Thus, it was not an abuse of discretion to admit evidence that defendant had recently actively participated in gang related activity.
>
> We find no grounds for reversal based on the admission of the evidence of the high school fight.

People v. Vongvilay, 2011 WL 2446684, at **5-6.

3. Discussion

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Romano v. Oklahoma, 512 U.S. 1, 12–13 (1994). "A habeas petition bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990). In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted), the Ninth Circuit explained that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Even if the trial court erred in allowing evidence to be admitted at trial, petitioner must show that the admission of such evidence had a "substantial and injurious effect on the jury's verdict." See Plascencia v. Alameida, 467 F.3d 1190, 1203 (9th Cir. 2006) (applying Brecht v. Abrahamson, 507 U.S. 619 (1993) harmless error analysis to claim that admission of evidence was improper).

Here, petitioner has not established that the state court violated clearly established federal law in holding admissible evidence of his participation in the May 2005 fight. See Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) ("Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions. Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process."). Thus petitioner's claim for habeas relief on this ground should be denied.

Accordingly, IT IS HEREBY ORDERED that the Clerk of Court assign a district judge to this action.

IT IS HEREBY RECOMMENDED that:

1. The petition for writ of habeas corpus (ECF No. 2) be denied; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are

////

////

1  advised that failure to file objections within the specified time may waive the right to appeal the

2  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  November 18, 2013

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / vong2680.hc